UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| DAVID DANIEL, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>AVESTA HOUSING MANAGEMENT )<br>CORP., *et al.*, )<br>)<br>Defendants ) | 2:12-cv-110-GZS |

**RECOMMENDED DECISION**

Plaintiff David Daniel claims unlawful housing discrimination on the basis of disability, in violation of the Maine Human Rights Act, 5 M.R.S. § 4582-A(2); the Fair Housing Amendments Act (FHAA), 42 U.S.C. § 3604; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. (Complaint, ECF No. 1-3.) His claims are focused on a change in the payment of a heating subsidy. He claims that the payment change left him with less money to spend on symptom relief from two disorders that rendered him unusually sensitive to room temperature. He also claims that the landlord's delay in installing an acceptable thermostat was unreasonable, but he does not dispute that the thermostat he eventually received went to an acceptable maximum temperature. Defendants Avesta Housing Management Corporation (Avesta), Scotch Hill Associates, LP (Scotch Hill), Crystal Chamberlain, and Deborah Perry have filed a motion for summary judgment on the basis there is no genuine issue of material fact and, as a matter of law, Avesta provided a reasonable accommodation within a reasonable period of time. (Motion, ECF No. 34.) I recommend that the court grant the motion.

## FACTS

Daniel was a resident at the Steeple Square apartment complex in Westbrook from 2002 to 2010, and he was a recipient of Section 8 assistance throughout his tenancy. (Complaint at ¶ 1, ECF No. 1-3; Answer at ¶ 1, ECF No. 1-2; Defendant's Statement of Material Facts (DSMF) at ¶¶ 1, 2, 18, ECF No. 35; Plaintiff's Opposing Statement of Material Facts (PSMF) at ¶¶ 1, 2, 18, ECF No. 48.) Daniel no longer lives at Steeple Square. (DSMF at ¶ 2; PSMF at ¶ 2.) Steeple Square is owned by defendant Scotch Hill, and it is managed and operated by defendant Avesta. (DSMF at ¶¶ 1, 3; PSMF at ¶¶ 1, 3.) Defendant Perry was the property manager at Steeple Square during the relevant times. (DSMF at ¶ 4; PSMF at ¶ 4.) Defendant Chamberlain was a regional property manager at Avesta beginning in February 2010. (DSMF at ¶ 5; PSMF at ¶ 5.) In the remainder of this recommended decision I refer to the defendants collectively as Avesta.

This case concerns a change, announced in December 2009 and implemented in March 2010, in Avesta's policy regarding the use of government assistance to pay for the natural gas used to supply heat, hot water heaters, and stoves at Steeple Square. (DSMF at ¶¶ 6-10; PSMF at ¶¶ 6-10.) Avesta's change in policy involved going from a system whereby residents received a heating allowance, from which they paid for their own heat, to a system whereby Avesta would obtain the allowance and pay for the heat itself. (DSMF at ¶¶ 6-8; PSMF at ¶¶ 6-8.) Daniel does not dispute that Avesta could choose which of these payment systems it preferred. (DSMF at ¶ 20; PSMF at ¶ 20.) Avesta's policy change affected a total of twelve to fourteen residents at Steeple Square, and after the new policy was implemented no tenants received the allowance directly anymore. (DSMF at ¶ 10; PSMF at ¶ 10.)

Both Avesta and Daniel have asserted that they saw a financial advantage in receiving the heating allowance and paying for heat. (DSMF at ¶¶ 11, 35; PSMF at ¶¶ 11, 35.) Avesta states that the new payment system was "an integral part of Avesta's plan to make Steeple Square a financially viable property." (DSMF at ¶ 11; PSMF at ¶ 11.)[1] Correspondingly, Daniel states that he wanted to keep the allowance to prevent a financial burden. (DSMF at ¶ 35; PSMF at ¶ 35.) Although Daniel did not receive the heating allowance as cash, it was deducted from his rent as determined by the Westbrook Housing Authority and reduced his portion of the rent. (DSMF at ¶¶ 19, 81-83; PSMF at ¶¶ 19, 81-83.) Daniel asserts that when he received the heating allowance directly and heating costs amounted to less than the allowance, he used the excess allowance to pay for medical expenses related to his disability, but Avesta contests whether Daniel used the money to cover medical expenses as opposed to other personal expenses. (DSMF at ¶¶ 82-83; PSMF at ¶¶ 82-83.) In contrast, when the subsidy was directed to Avesta, it was added to Daniel's rent. (DSMF at ¶ 19; PSMF at ¶ 19.) Daniel makes what appear to be conflicting statements about the cost to him of the change, but he does state that Avesta's change in policy did not change the bottom line of his personal finances, due to adjustments made by the Westbrook Housing Authority. (PSMF at ¶¶ 8, 12.) As explained in the discussion section below, I conclude that these factual disagreements do not affect the outcome.

Avesta's policy change was accompanied by a change to new thermostats that restricted the temperature in Steeple Square apartments to a maximum of 73 degrees Fahrenheit. (DSMF

---

[1] Daniel objects to the defendants' use of an affidavit dated after the conclusion of the discovery period to support this fact statement (PSMF at ¶11), but Fed. R. Civ. P. 56(c) does not require supporting affidavits to have been created during the discovery period. He also objects on the basis that Avesta made conflicting statements about the financial effects of taking the heating allowance. (PSMF at ¶ 80.) Thus, the economic effect on Avesta of its decision to take the heating allowance is a fact in dispute. I fail to see the materiality of this particular factual dispute, however, because it is undisputed that the regulations allowed Avesta to proceed in the manner it chose regarding the heating allowance.

at ¶ 13; PSMF at ¶ 13.)  Daniel asserts that Avesta's change had a medical impact on him due to pain from fibromyalgia and a nervous system disorder that rendered him sensitive to cold. (DSMF at ¶¶ 24, 37; PSMF at ¶¶ 24, 37; Letter, ECF No. 48-8.)  Daniel admits that his primary care physician does not treat him for his sensitivity to cold; rather, he arranges treatment on his own, without prior authorization, with a massage therapist, an acupuncturist, an osteopathic physician, and a physical therapist.  (DSMF at ¶ 76; PSMF at ¶ 76.)

Daniel made the following three requests for accommodation, all of which appear to date from conversations and communications that began in December 2009 (DSMF at ¶ 21; PSMF at ¶ 21):

First, Daniel asked for a space heater.  (DSMF at ¶ 35; PSMF at ¶ 35.)  Avesta denied this request because it was concerned about the risk of fire.  (DSMF at ¶¶ 54-56, 59; PSMF at ¶¶ 54-56, 59.)  It is undisputed that Daniel's lease prohibits the use of space heaters absent written permission from Avesta and that Avesta had a general policy in this regard, for fire prevention. (DSMF at ¶¶ 54-58; PSMF at ¶¶ 54-58.)  Also, Daniel admits that he did not keep his apartment neat and orderly.  (DSMF at ¶ 62; PSMF at ¶ 62.)  He states that he was "unable to keep his apartment in a state of constant upkeep due to his disability."  (DSMF at ¶ 62; PSMF at ¶ 62.) Although he admits that on one inspection there was an abundance of paper in the apartment, he asserts that he kept combustible materials safely away from space heaters when they were in use, and he had used space heaters for about two years without incident.  (DSMF at ¶ 63; PSMF at ¶ 63.)

Second, Daniel asked to retain his heat allowance.  (DSMF at ¶ 35; PSMF at ¶ 35.)  He asserted that "[w]ithout the utility allowance, [he] could not afford to keep the symptoms from

his disability under control." (DSMF at ¶ 80; PSMF at ¶ 80.) It is implicit in the parties' statements of fact that Avesta denied this request. (DSMF at ¶ 81; PSMF at ¶ 81.)

Third, Daniel asked for an unrestricted thermostat. (DSMF at ¶ 35; PSMF at ¶ 35.) Avesta granted this request in April 2010 by installing a thermostat that went to a high of 78 degrees, and Daniel admitted that a maximum of 78 degrees was consistent with his usual heating choice. (DSMF at ¶¶ 28, 35, 47-49; PSMF at ¶¶ 28, 35, 47-49; Letter, ECF No. 35-20.) However, because Daniel claims that Avesta delayed unreasonably, I review the parties' communications and actions from December 2009 to April 2010. Avesta wrote to Daniel in December 2009 that Avesta would be taking the heating allowance effective February 1, 2010. (DSMF at ¶ 6; PSMF at ¶ 6; Letter, ECF No. 35-5.) Another letter sent by Avesta to Daniel in December 2009 stated that the unrestricted thermostats that were then in the apartments would be replaced with the 73-degree-maximum restricted thermostats, but the letter did not state when this change would occur. (DSMF at ¶ 6; PSMF at ¶ 6; Letter, ECF No. 35-7.)

Daniel states that he contacted Avesta in December 2009 to discuss his concerns about the restricted thermostat and Avesta told him he could submit a request for a reasonable accommodation. (DSMF at ¶¶ 21-23; PSMF at ¶¶ 21-23.) In December 2009, Avesta provided him with a request form to fill out and submit; Daniel asserts that the form he received was incomplete although he did not know it at the time. (DSMF at ¶¶ 23-26; PSMF at ¶¶ 23-26.)

In early February 2010, Daniel forwarded to Avesta a letter from his primary care doctor. (DSMF at ¶ 24; PSMF at ¶ 24; Letter, ECF No. 48-8.) The doctor stated of Daniel's medical condition: "In order to control the burning pain from significant response to cold he needs to be able to regulate the thermostat in his apartment and have the use of electrical space heaters available to him." (DSMF at ¶ 27; PSMF at ¶ 27; Doctor's letter at 1.) Daniel states that he

5

refused to sign Avesta's reasonable-accommodation request form, however, because that would have given Avesta unrestricted access to his medical records. (DSMF at ¶ 24; PSMF at ¶ 24.) He also refused to sign a lease addendum for the new payment system, and he asserts he eventually signed it under duress. (DSMF at ¶ 25; PSMF at ¶ 25.)

Daniel asserts that there were a few reasons why he was delayed in submitting Avesta's form for a reasonable accommodation request. First, the doctor's letter omitted a reference to Daniel's need for massage therapy, and so Daniel asked her for a revised letter that included the reference to that therapy. (DSMF at ¶ 25; PSMF at ¶ 25.) Second, an attorney who Daniel states was providing him with some sort of limited representation was trying to resolve some issues with Avesta through mid-February 2010. (DSMF at ¶¶ 25-26; PSMF at ¶¶ 25-26.) Third, Daniel asserts that he did not receive a complete request form from Avesta until February 5, 2010, although he contests whether Avesta may require the form at all given that it already had the necessary information in the doctor's letter. (DSMF at ¶¶ 25-26, 29; PSMF at ¶¶ 25-26, 29.)

Avesta sent Daniel a letter dated February 22, 2010, stating that the thermostats would be changed on March 1, 2010. (DSMF at ¶ 13; PSMF at ¶ 13; Letter, ECF No. 35-8.) Daniel's next letter to Avesta was dated March 1, 2010, and addresses the financial burden of not receiving the heating allowance, his medical needs and symptoms, his receipt of the request form and his prior receipt of an incomplete form, his request for an unrestricted thermostat, and his doctor's letter, among other things. (DSMF at ¶ 27; PSMF at ¶ 27; Letter, ECF No. 35-16.) By letter dated March 5, 2010, from Avesta to Daniel, Avesta detailed the reasonable-accommodation proceedings. (DSMF at ¶ 31; PSMF at ¶ 31; Letter, ECF No. 35-17.) By letter dated March 11, 2010, Daniel discussed the financial burden on him, presented various options to Avesta, and asked for a space heater. (DSMF at ¶ 32; PSMF at ¶ 32; Letter, ECF No. 35-18.)

On March 18, 2010, Daniel, through his doctor, submitted a copy of Avesta's reasonable-accommodation form, requesting a thermostat that was not restricted to a high of 73 degrees. (DSMF at ¶ 34; PSMF at ¶ 34; Request Form, ECF No. 35-19.) Avesta granted his request by letter dated March 26, 2010, and on April 16, 2010, it installed a thermostat that went to a high of 78 degrees. (DSMF at ¶¶ 35, 47-49; PSMF at ¶¶ 35, 47-49; Letter, ECF No. 35-20.) Daniel agreed that a thermostat with an upper limit of 78 degrees was acceptable. (DSMF at ¶ 28; PSMF at ¶ 28.) He stated that he would typically keep the temperature between 72 and 78 degrees. (DSMF at ¶ 73; PSMF at ¶ 73.) Avesta asserts that the three-week delay between the date on which the request was granted and the date on which the 78-degree-maximum thermostat was installed was due to the wait from the distributor; Daniel does not admit this fact due to lack of knowledge. (DSMF at ¶ 50; PSMF at ¶ 50.)

Some of the facts that Daniel asserts in support of his argument that Avesta unreasonably delayed relate to the authority of the individually-named defendants and the decision-making process within Avesta. (DSMF at ¶¶ 43-46; PSMF at ¶¶ 43-46.) I conclude that to the extent the parties dispute who had what authority within Avesta, those disputes are not material to the legal issues to be decided. It is undisputed that both Perry and Chamberlain were agents of Avesta. (Complaint at ¶¶ 4, 5; Answer at ¶¶ 4, 5.) Daniel has not presented any evidence concerning Chamberlain, Perry, or anyone else at Avesta that alters my conclusion as to the claim of delay or any of his other claims.

Daniel filed a discrimination claim with the Maine Human Rights Commission, which dismissed the claim pursuant to 5 M.R.S.A. § 4612(2), according to the complaint and answer. On February 27, 2012, Daniel filed a complaint in state court seeking injunctive relief, compensatory and punitive damages, costs, and attorney fees. The defendants accepted service

on March 27, 2012. The defendants timely removed the case to this court, pursuant to 28 U.S.C. §§ 1331, 1441(a), based on federal question jurisdiction. See 28 U.S.C. § 1446(b). The defendants filed a motion for summary judgment on January 2, 2013. Daniel received two extensions of time to file his response. He filed a response that was timely but noncompliant because it exceeded the court-ordered extended page limit.

## DISCUSSION

### 1. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986)). The court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in his favor. Hannon v. Beard, 645 F.3d 45, 47-48 (1st Cir. 2011). If the Court's review of the record reveals evidence sufficient to support a judgment in favor of the non-moving party on one or more of his claims, then there is a trial-worthy controversy and summary judgment must be denied to the extent there are supported claims. Id. Unsupported claims are properly dismissed. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

### 2. Excessive Length of Daniel's Summary Judgment Filings

I feel compelled to address Daniel's decision to ignore my order concerning the page limit for his opposition to the motion for summary judgment. Local Rule 7(e) allows the parties

8

a maximum of twenty pages for a memorandum of law in support of or opposition to a motion for summary judgment, and the rule contains additional provisions for spacing and font size. Daniel filed a motion to exceed the page limit but did not specify by how many pages, and I granted his motion, specifically allowing him thirty-five pages for his response. He then filed a response that was fifty-seven pages long accompanied by another motion to exceed the page limitations previously set. Both the motion to exceed the page limit, the substantive response and the statement of "material" facts were filed on the date the pleading was due, May 1, 2013. By that point in time I had no alternative but to allow the pleading, even though Daniel had utterly failed to comply with the rules. Further delay would not have been in anyone's best interest, given the lengthy time that Daniel had to properly prepare his response. (The response was initially due on February 20, 2013, one month longer than the normal response deadline, and then was extended two more times to May 1.) Although Daniel is acting pro se, his status as a pro se litigant does not excuse him from the obligation to comply with the court's procedural rules. See Ruiz Rivera v. Riley, 209 F.3d 24, 27-28 & n.2 (1st Cir. 2000) ("We have held consistently that pro se status does not free a litigant in a civil case of the obligation to comply with procedural rules.").

     As discussed below, I recommend that the motion for summary judgment be granted because there is no genuine issue of material fact and the defendants are entitled to judgment as a matter of law. However, I also note that Daniel failed utterly to comply with the court-ordered page limit. See id. Furthermore, although I accepted Daniel's statement of facts as filed, it is worth noting that it was sixty pages long, single-spaced or close to single-spaced, in response to Avesta's ten-page statement of facts. I conclude that on the merits Daniel's claims should not go to trial, but I cannot help but note that the excess verbiage not only fails to comply with the Local

Rule 56 requirement that the statement of fact be short and concise―his excessively long statement of facts significantly detracts from his message.

### 3. Daniel's claims

#### a. Legal standards applicable to housing discrimination claims

Daniel asserts claims under both federal and state law. Maine state courts look to federal case law for guidance in interpreting the Maine Human Rights Act, 5 M.R.S. § 4582-A. See Russell v. ExpressJet Airlines, Inc., 2011 ME 123, ¶ 13, 32 A.3d 1030, 1035.

The Fair Housing Amendments Act (FHAA) "prohibits discriminatory housing practices based on a person's handicap." Astralis Condo. Ass'n v. Sec'y, U. S. Dep't of Hous. & Urban Dev., 620 F.3d 62, 66 (1st Cir. 2010) (citing 42 U.S.C. § 3604(f)). Subsection 3604(f)(2) of the statute states that it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap" of the renter or certain other persons. The term "handicap" is defined as "(1) a physical or mental impairment which substantially limits one or more of [a] person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h). "Discrimination includes a 'refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [handicapped persons] equal opportunity to use and enjoy a dwelling.'" Astralis, 620 F.3d at 66 (quoting 42 U.S.C. § 3604(f)(3)(B)).

The First Circuit noted that there was not much case law in this circuit, but that the FHAA is interpreted "'in tandem'" with the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, and authority under the ADA "is generally persuasive in assessing handicapped discrimination claims under the FHAA." Id. (quoting Tsombanidis v. W. Haven Fire Dep't, 352

F.3d 565, 573 n.4 (2d Cir. 2003)).  The First Circuit has noted the elements of a prima facie case of failure to accommodate:

> To establish a prima facie case of failure to accommodate under the FHAA, a claimant must show that he is handicapped within the purview of 42 U.S.C. § 3602(h) and that the party charged knew or should reasonably have known of his handicap.  Next the claimant must show that he requested a particular accommodation that is both reasonable and necessary to allow him an equal opportunity to use and enjoy the housing in question.  Finally, the claimant must show that the party charged refused to make the requested accommodation.

Id. at 67 (citations omitted).

Daniel also asserts a claim under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  Section 794 states in part: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  A number of courts "have held 'that in enacting the anti-discrimination provisions of the FHAA, Congress relied on the standard of reasonable accommodation developed under section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794.'"  Hovsons, Inc. v. Township of Brick, 89 F.3d 1096, 1101 (3d Cir. 1996) (quoting Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 334 (2d Cir. 1995)).

> The Rehabilitation Act does not contain a general accommodation requirement. Rather, in implementing the Rehabilitation Act, the Department of Health and Human Services . . . promulgated several regulations that specifically require reasonable accommodations.  The most pertinent of these regulations requires recipients of federal funds to "make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program."

Wisconsin Cmty. Servs., Inc., v. City of Milwaukee, 465 F.3d 737, 746-47 (7th Cir. 2006) (quoting 28 C.F.R. § 41.53) (citing Traynor v. Turnage, 485 U.S. 535, 550 n.10 (1988)).

### b. The delay in providing a 78-degree thermostat

There is no dispute that Avesta provided Daniel with a thermostat that went to 78 degrees Fahrenheit, and this was satisfactory to Daniel. He does dispute whether the provision of the thermostat was a complete solution concerning the temperature in the apartment, because he wanted a space heater as well. However, his claim as to the thermostat is that it was unreasonably delayed, not that it was denied. Avesta argues that it is entitled to judgment as a matter of law because the delay was not unreasonable. Avesta argues that the delay that occurred before March 26, which was the date on which it approved the request, is explained in large part by Daniel's failure to respond to Avesta's request for information. It argues that the delay after the March 26 date is due to the time that it took the distributor to get the thermostat to Avesta.

An "unreasonable delay may amount to a failure to provide reasonable accommodations." Valle-Arce v. Puerto Rico Ports Auth., 651 F.3d 190, 200 (1st Cir. 2011). In Valle-Arce, the Court cites several additional First Circuit cases that help illuminate the circumstances that may constitute an unreasonable delay. Id. (citing Astralis, 620 F.3d at 68-69; Calero-Cerezo, 355 F.3d at 25; Soto-Ocasio v. Fed. Express Corp., 150 F.3d 14, 19 (1st Cir. 1998); Jacques v. Clean-Up Grp., Inc., 96 F.3d 506, 515 (1st Cir. 1996)). In Astralis, the Court held that a delay of a year or more was the equivalent of a denial, by a condominium association, of an accommodation request for a special parking space. 620 F.3d at 68-69. In Calero-Cerezo, the Court cited ADA regulations and noted that "[i]n some cases, a request for a reasonable accommodation may trigger a responsibility on the part of the employer to enter into an interactive process"―in that case between employer and employee. 355 F.3d at 23-24 (citing inter alia 29 C.F.R. § 1630.2(o)(3)). The court held that a factfinder could conclude that the

defendants "failed to engage in any good faith interactive process to explore whether some variant of the plaintiff's proposal might have been workable." Id. at 24-25.  In Jacques, the court upheld a jury verdict in favor of on employer on a reasonable accommodation claim.  96 F.3d at 509.  The Court noted that although the employer did not suggest any alternative after it rejected the plaintiff's proposed accommodation, there was also no evidence that the employer failed to consider the employee's requested accommodation or tried to "sweep the problem under the rug."  Id. at 515 (quotation marks omitted).

     I conclude that there is no genuine issue of fact for trial concerning the delay because no reasonable factfinder could find that Avesta failed to engage in an interactive process with Daniel or failed to consider Daniel's request.  Once Daniel expressed his concerns in December 2009, Avesta became engaged right away by getting a request form to him.  Even if I credit Daniel's assertion that the form Avesta provided was incomplete, it was Daniel who delayed until early February to get the doctor's letter to Avesta—although that delay does not appear to have been the fault of either Daniel or the doctor, for that matter.  From early to mid-February, Daniel's attorney was communicating with Avesta.  After the thermostats were changed on March 1, 2010, there was further communication between the parties.  Avesta acted on Daniel's request on March 26, just eight days after he submitted the form.  I have considered Daniel's argument that Avesta should have acted once it received the doctor's letter in early February, but I find that unpersuasive because there are simply no facts even remotely suggesting that Avesta was stonewalling or otherwise failing to consider his request.

     **c.  The denial of the space heater**

     I conclude likewise that there is no genuine issue of material fact concerning Daniel's request for a space heater.  Daniel makes much of the fact that on one occasion his doctor

indicated he needed both a space heater and an unrestricted thermostat. However, it is undisputed that he kept the apartment in a cluttered state. No reasonable factfinder would consider Avesta's denial of the space heater unreasonable given that Daniel has admitted to facts indicating that there was a fire safety risk. The FHAA states: "Nothing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others." 42 U.S.C. § 3604(f)(9). Daniel did not receive exactly the accommodation he was seeking, but he does not dispute that the 78-degree thermostat enabled him to achieve the ambient temperature he was seeking for his medical condition. In these circumstances, I conclude that as a matter of law, Avesta's grant of the request as to the thermostat but denial of the space heater was a reasonable accommodation. I conclude that the court need not address whether Avesta's policy against space heaters would alone have been a sufficient basis on which to deny the request, because in this case there was evidence of a fire hazard.

      **d.  The denial of an exception to Avesta's new heating allowance policy**

Daniel argues that there was a direct connection between his request for a financial accommodation and his disability. (Response at 3.) His argument is that the heating allowance is linked to his disability because he used any excess money from the allowance to help pay for medical treatment to alleviate his symptoms. Avesta argues that there is no direct link between the heating allowance payment system and Daniel's disability, and Daniel was not entitled to a financial accommodation.

The FHAA's requirement of a reasonable accommodation is imposed only "when such accommodations may be necessary to afford [a] person equal opportunity to use and enjoy a

dwelling." 42 U.S.C. § 3604(f)(3)(B); see Astralis, 620 F.3d at 66. Here, Avesta appropriated the heating allowance—which Daniel admits it had the option to do—but in return Avesta provided a reasonable accommodation for Daniel in the form of the thermostat that went to 78 degrees. The provision of the thermostat addressed the disability and rendered the payment of the heating allowance an unnecessary accommodation. The thermostat gave Daniel "equal opportunity to use and enjoy" the apartment. Therefore, Avesta did not unlawfully discriminate against Daniel when it denied him the heating allowance, notwithstanding that Daniel asserts he needed the excess from the heating allowance to help him pay for medical treatment for his disability. Because the heating allowance was an unnecessary accommodation, any factual dispute over how Daniel spent the excess is irrelevant.

Because the thermostat was a sufficient and reasonable accommodation, the court need not independently address the issue whether Avesta improperly denied Daniel a financial accommodation. However, I address it nonetheless, simply to identify a split of authority, in the event the court decides to reach the issue. The Supreme Court case of U.S. Airways, Inc. v. Barnett, 535 U.S. 391 (2002), is not directly on point but has language that other courts have interpreted in cases involving requests for financial accommodation. In U.S. Airways, the reasonable accommodation that the employee requested was to be assigned to a job he would otherwise have lost to another employee due to the employer's seniority system. Id. at 393-94. The Court held that "the seniority system will prevail in the run of cases," but "[t]he plaintiff remains free to present evidence of special circumstances that make 'reasonable' a seniority rule exception in the particular case." Id. at 394.

The First Circuit apparently has not yet rendered an opinion that addresses a situation in which the reasonable accommodation requested was a financial accommodation. There is a split

15

among some of the other circuit courts as to how to interpret U.S. Airways. There are two relevant cases from the Second Circuit, the first of which predated U.S. Airways. In Salute v. Stratford Greens Garden Apartments, 136 F.3d 293, 301 (2d Cir. 1998), the court noted: "We think it is fundamental that the law addresses the accommodation of handicaps, not the alleviation of economic disadvantages that may be correlated with having handicaps." The second relevant case from the Second Circuit is Daniels v. Brooklyn Estates & Props. Realty, 413 Fed. App'x 399 (2d Cir. 2011), in which the plaintiff had requested "a reasonable accommodation from the financial requirements applicable to prospective tenants" relating to income and credit. Id. at 401. The court affirmed a grant of summary judgment to the defendant, noting that "[l]ike the plaintiffs in Salute, what stood between this plaintiff and the apartment he sought '[w]as a shortage of money, and nothing else.'" Id. (quoting Salute, 136 F.3d at 302). The court in Daniels held that the plaintiff presented no special circumstances. Id. (citing U.S. Airways, 535 U.S. at 405). The Seventh Circuit has decided the issue similarly. See Hemisphere Bldg. Co., Inc. v. Village of Richton Park, 171 F.3d 437, 441 (7th Cir. 1999).

The Ninth Circuit, on the other hand, explicitly rejected the approach taken in Daniels. In Giebeler v. M & B Assocs., 343 F.3d 1143 (9th Cir. 2003), the court required apartment owners to provide a financial accommodation consisting of an individualized assessment of non-payment risk for a disabled, unemployed prospective tenant whose mother offered to co-sign for him. Id. at 1144-45. The Ninth Circuit interpreted U.S. Airways to hold "that accommodation requirements (1) do sometimes require preferring disabled individuals over others who are otherwise similarly situated but are not disabled; and (2) are not limited only to lowering barriers created by the disability itself." Giebeler, 343 F.3d at 1154.

Although I conclude that the court need not reach the issue, I would conclude on the merits that Daniel has not demonstrated special circumstances of the type to warrant an exception to Avesta's policy on the heating allowance. See U.S. Airways, 535 U.S. at 394. Avesta also argues that it would be a fundamental alteration of the rental program to require it to grant the financial accommodation. (Motion at 16.) Of course, if the U.S. Airways "special circumstances" were present in this case, those circumstances might require Avesta to create an exception that would alter its rental program as to Daniel.

### e.  Evidence of causation

Avesta argues that it is entitled to summary judgment on the basis that Daniel lacks a qualified expert and therefore cannot establish that any action or inaction by Avesta caused a worsening of his symptoms. (Motion at 21-23.) I conclude that the court need not reach this issue because in any event Avesta provided an acceptable thermostat within a reasonable period of time and thus essentially provided the reasonable accommodation that Daniel sought.

### CONCLUSION

For the reasons set forth above, I recommend that the court grant the defendants' motion for summary judgment.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

July 9, 2013                                /s/ Margaret J. Kravchuk
                                            U.S. Magistrate Judge